# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| GREGORY C. BECKER, | CASE NO. 4:09CV3027 |
| Plaintiff, | |
| vs. | MEMORANDUM AND ORDER |
| MICHAEL J. ASTRUE,<br>Commissioner of the Social Security Administration, | |
| Defendant. | |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401, *et seq.* The Court has carefully considered the record and the parties' briefs (Filing Nos. 13, 18).

## PROCEDURAL BACKGROUND

On April 1, 2005, the Plaintiff, Gregory C. Becker, filed his application for disability insurance benefits. (Tr. 61-65.) The application was denied initially and on reconsideration. (Tr. 14.) Becker requested a review and a hearing before an administrative law judge ("ALJ"). (Tr. 46-60.) On June 21, 2008, after a hearing at which Becker was represented by his current attorney (Tr. 457-84), the ALJ, James P. Berry, issued his written opinion that Becker was not under a disability at any time through the date of his decision (Tr. 14-23). On December 9, 2008, the Appeals Council denied Becker's request for review. (Tr. 5-7.) Therefore, the ALJ's decision constitutes the Commissioner's final decision subject to judicial review.

**FACTUAL BACKGROUND**

Becker alleges a disability that began on February 25, 2005, as the result of a stroke, balance problems, and general left-side numbness. (Tr. 61, 74, 461.) Becker is now fifty years old. (Tr. 61.) He has a high school education and took two years of college classes. (Tr. 80, 460.) He has a welder's certificate and worked as a welder for many years prior to his alleged disability onset date. (Tr. 75, 85, 93, 461.) After Becker's alleged disability onset date, he worked 4 hours daily as a janitor. His janitorial job lasted from July of 2006 through April of 2008. (Tr. 16, 68, 71, 461.)[1]

*Medical Evidence*

On March 4, 2005, Becker went to the BryanLGH Medical Center with a five-day history of dizziness, nausea, numbness, clumsiness, and vision problems. (Tr. 145, 151, 181.) An MRI and a CT head scan revealed findings consistent with an infarction involving the cerebellar hemispheres, right greater than left. (Tr. 176, 179-80, 189.) After receiving blood thinners, Becker's condition stabilized and he was admitted. (Tr. 151.) On March 25, 2005, Becker was discharged with a diagnosis of "brainstem stroke with ataxia, visual changes." (Tr. 134.)

Upon his discharge, Becker was told not to drive. However, he walked independently 300 feet with crutches and climbed stairs using a rail. (Tr. 134.) Becker's treating physician, George J. Wolcott, M.D., stated that Becker could not return to work at that time based on his continued problems with balance, left-arm ataxia, and vision tracking due to his stroke. (Tr. 247.)

---

[1] According to the vocational expert, Becker's work as a janitor was at a medium exertional level. (Tr. 479-80.)

On April 22, 2005, Becker saw Michael Sullivan, M.D., at the Memorial Health Clinic for followup. Becker's vision and balance were very good, and he was no longer dizzy. Although he still had problems with stamina, Becker asked for permission to start driving and was also willing to start a work hardening program. On examination, Becker could stand without weakness, walk without a cane, and turn around with good balance. Dr. Sullivan suggested that Becker first try driving in an empty parking lot with his wife, and he started Becker on physical therapy for work hardening and wrote a note stating that Becker should not work for the next month. (Tr. 280.)

On May 20, 2005, Becker underwent a "Physical Capacity Profile." (Tr. 228-30.) The testing showed that Becker could perform medium-level work, which required him to exert "20 to 50 pounds of force occasionally, and/or up to 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly." (Tr. 228.)

On May 24, 2005, Becker returned to Dr. Sullivan for followup. Becker said that he was "doing well with physical therapy," was driving, and had no specific problems. He was experiencing a decreased tolerance to heat. Therefore, Dr. Sullivan told him to look for other employment as he would not be able to work in a hot welding environment. (Tr. 279.) That same day, Becker began vocational rehabilitation. He said that he had worked as a welder at Thermo King for 20 years and, if possible, he wanted to return to work there in some capacity. (Tr. 207.)

On June 2, 2005, Becker told his vocational rehabilitation specialist, Frank Koch, of his continued problems with stamina and steadiness. He reiterated that he wanted to return to Thermo King but was concerned about working in the heated environment. (Tr. 207.)

On June 20, 2005, after a short standing exercise, Becker perspired profusely and needed to rest. (Tr. 206.) Dr. Sullivan opined that Becker could work for a maximum of 4 hours daily in an environment that was air-conditioned in the summer. (Tr. 277-78.) On July 7, 2005, Koch noted that Becker's stamina was improving and that Becker could complete work sample exercises without breaks or excessive perspiration. (Tr. 205.) Becker reported that he was interested in "job shadowing at a later time but [he questioned] his readiness for work at [that] time." (Tr. 204.) Koch recommended that Becker continue strengthening activities, including occupational therapy, physical therapy, and volunteer work. On August 30, 2005, Becker told Koch that he was volunteering two days weekly at a local hospital, and that he had applied for a part-time security guard job at the hospital. (Tr. 204.)

On September 7, 2005, a state-agency physician completed a residual functional capacity ("RFC") assessment based on his record review. (Tr. 194-201.) The physician opined that Becker, despite his past stroke, could lift 20 pounds occasionally and 10 pounds frequently, stand or walk 2 hours in an 8-hour workday, sit 6 hours in an 8-hour workday, frequently balance, and occasionally climb stairs, stoop, kneel, crouch, and crawl. (Tr. 195-96.) The physician noted slow but steady improvement, opined that Becker did not meet the "listings," and stated that Becker could be expected to do light work activity one year after the date of his stroke. (Tr. 199.) On September 12, 2005, Becker returned for vocational rehabilitation. (Tr. 203.) Koch noted that Becker seemed to be "stabilizing more now," and that Becker thought he could "do part time work now with hopes that he [could] increase his hours over time." (Tr. 203.)

On September 15, 2005, Becker went to the Memorial Health Clinic for a followup visit. His gait and balance had improved, but he still had difficulty with his stamina. Although Becker said that he helped his wife with housework, he said he felt "totally wiped out" after walking for only 15 minutes. (Tr. 273.) Becker noted, however, that he was volunteering at a hospital a couple times monthly, and that his vocational rehabilitation specialist was trying to find him an appropriate job. (Tr. 273.) On September 27, 2005, Becker was discharged from his physical therapy because he had exhausted his insurance therapy coverage. A discharge report noted: Becker had participated in therapy to increase his upper body strength and coordination; his most recent muscle test scores indicated full (5/5) strength in his right upper extremity and full (5/5) or near full (4/5) strength in his left upper extremity; and his gross grip strength had improved. (Tr. 213.)

On January 16, 2006, Becker saw Virginia White, R.N., for counseling. He told White that he had applied for part-time jobs delivering food to the elderly and as a hotel desk clerk. Becker chose those jobs because they would not require him to work early in the morning. (Tr. 300.) The next week, however, Becker reported that he was going to stop looking for work because he had not been getting any interviews and he felt there were not "any jobs that would really fit his situation." (Tr. 299.) Significantly, Becker also noted that he had a busy week scheduled with his family, including taking a grandchild's class to a bowling party.[2] (Tr. 299.) On January 25, 2006, Becker told White that he continued to struggle to figure out what kind of job he could perform given his limited

---

[2]The grandchild, then age twelve, lived with Becker and his wife along with three other grandchildren. One of the children has anger management issues. (Tr. 470.) White's notes include many references to family and children's activities. (*See, e.g.,* Tr. 299-314, 426.)

5

energy level. Becker noted his doctor had suggested an assembly job where he could take breaks every 20 minutes, but Becker did not believe any such job existed. He also stated that he could not work at a restaurant cleaning dishes because he could not stand for long periods. (Tr. 298.) Five days later, however, Becker told White that he was thinking about starting his own car wash business. (Tr. 298.) Becker told White there was a car wash for sale nearby that also had vacant land where he could "probably plant sweet corn and raise a garden there and sell the products." (Tr. 297.)

During 2006, Becker often returned to see White for counseling and to discuss his daily activities. On May 25, 2006, Becker told White that he had a "busy day working outside and doing some mowing," and that the "day went pretty well." (Tr. 426.) On June 7, 2006, Becker told White that he "was getting better" and that "he could be a greeter in Wal Mart" or work at a Kmart or Head Start. He noted, however, that his "daily schedule [was] pretty tight with taking the boys so many places," and that "it would hardly be worth getting a job" if he had to hire someone to transport the boys to their activities. (Tr. 425.) On June 13, 2006, Becker similarly remarked that he was "very busy just trying to keep up with the boys" this summer, and, on June 14, 2006, he told White that he had "spent a good deal of the afternoon at the ball park" with his grandson. (Tr. 424, 425.) On July 10, 2006, Becker said that he went to the Omaha Zoo and stayed in a motel. Two days later, Becker told White he was planning to take the grandchildren to a baseball game and things were "going pretty good." (Tr. 423.) On July 17, 2006, Becker reported that he was working part-time as a janitor. (Tr. 422.) On August 23, 2006, Becker remarked that he was adjusting "very well" to his job, and that he might start working in the mornings instead of the afternoons so that he could have afternoons for his grandchildren. (Tr. 417.) On

October 18, 2006, Becker told White that he was planning to sign up to be a Boy Scout troop leader for his grandson.  (Tr. 410.)  On October 24, 2006, Becker noted that his job was getting easier for him each day (Tr. 410), and, on November 2, 2006, he mentioned that he was helping out with a church dinner.  (Tr. 409.)

On November 9, 2006, Becker saw his new treating physician, Jeffrey Muilenburg, M.D.  Becker was generally doing "significantly better."  He had become more active and was working 4 hours daily.  (Tr. 344.)  On December 7, 2006, Becker told White that he enjoyed working.  (Tr. 406.)  On January 11, 2007, he noted he had plans to take his grandchildren to a car show (Tr. 403.)  On March 23, 2007, Becker told White that he was having a busy week caring for his grandchildren.  (Tr. 398.)  On May 11, 2007, Becker said he had attended a job fair.  (Tr. 394.)  However, on June 1, 2007, Becker told White that he could not work a full 8-hour workday where "he would have to do a lot of heavy lifting or concentrated work" for 8 hours a day.  (Tr. 392.)  On June 5, 2007, Becker told White that he was "busy with ball games and other activities [with] the boys," and on June 28, 2007, Becker reported that he was going camping over the weekend with his grandson's Boy Scout troop.  (Tr. 392, 389.)  Becker noted that the summer was "very busy with the boys."  (Tr. 389.)

On July 5, 2007, Dr. Muilenburg noted that Becker continued to work part-time as a janitor, and that he was "doing quite well with that" despite being tired.  (Tr. 332.)  On August 8, 2007, Becker noted during a visit with White that he and his wife had "a very busy life" with the kids' swimming lessons.  (Tr. 386.)  On June 6, 2008, Dr. Muilenburg completed a Medical Source Statement in which he opined that Becker could sit only 4 hours and stand and walk only 3 hours during an 8-hour work day.  (Tr. 447.)

7

***Becker's Testimony***

On June 9, 2008, Becker testified at the administrative hearing before the ALJ. (Tr. 460-74.) He testified with respect to his educational background, welding experience since 1984, and his recent janitorial job that he held from July 2006 through April 2008. (Tr. 461.) He stated that he worked 4 hours daily. He left the job because his boss expected him to perform better. (Tr. 462.) He testified that after his stroke he had to relearn how to walk. His rehabilitation allowed him to "walk good now," although his balance is not as good as it was before his stroke. He tires with work or chores such as laundry or mopping a floor, and if he sits too long he becomes stiff and sore. (Tr. 462, 464.) He described his heat intolerance that resulted from his stroke. (Tr. 462-63.) He naps for 1 or 2 hours daily if he is able to do so, depending on "how busy we've been." (Tr. 464.) He notices problems with his short term memory. (Tr. 465.) White helps him with biofeedback to improve his memory, which he finds helpful. (Tr. 466.) Becker stated that he suffers some depression and has been diagnosed with sleep apnea, for which he uses a BiPaP machine when he sleeps. (Tr. 467.) Becker testified that he cannot work 8 hours a day because he could not handle the stress and would be too tired. (Tr. 467-68.) When he was working 4 hours daily, his activities at home included: laundry; cleaning dishes and putting things away; taking the trash out; getting his grandchildren ready for school; and taking the grandchildren to school, counseling sessions, and wrestling; and Boy Scout activities. Becker testified that he did not mow the lawn. (Tr. 469-70.) Becker states that he could: repetitively lift and carry 25 pounds; occasionally lift and carry 50 pounds; stand 1 hour before having a break; walk for one-half hour twice a day; and sit for 40 minutes. (Tr. 471-73.)

*Deb Becker's Testimony*

Becker's wife, Deb Becker, testified that she had been married to Becker for eight years as of the date of the hearing. (Tr. 475.) She testified that Becker continues to have problems with his balance, particularly when walking on uneven surfaces. She testified that he has problems with his memory, concentration, and attention. (Tr. 476-77.) She testified that Becker sleeps between 10 and 11 hours at night and takes 1 or 2 naps during the day. (Tr. 478.) Ms. Becker stated that she works and Becker helps her with the grandchildren as much as he can. (Tr. 478.)

*Vocational Expert's Testimony*

The ALJ asked the vocational expert ("VE"), Cheryl R. Chandler, to consider a hypothetical claimant of Becker's age, education, and work experience, who was limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently, and sitting, standing, and walking 6 hours each during an 8-hour workday. The claimant also would: be limited to performing simple, repetitive work tasks; have the ability to maintain attention, concentration, persistence, and pace; and be able to relate to and interact with others, adapt to changes in the workplace, and follow safety rules. The vocational expert testified that such a claimant could not perform Becker's past work. However, the claimant could perform light, unskilled work as a food preparation worker (2,900 jobs in Nebraska), custodian (1,500 jobs in Nebraska), and housekeeper/laundry worker (2,500 jobs in Nebraska). Those jobs are also available in large numbers in the national economy. (Tr. 480-81.) The vocational expert testified, however, that Becker would be unable to perform full-time work existing in the national economy if he was limited to: lifting a maximum of 25 pounds; walking only on even terrain; difficulty with stressful situations, adapting to change

in a work setting, persistence, and pace; and a total of 2 hours sitting, 1 hour standing, and 1 hour walking. (Tr. 481.)

## THE ALJ'S DECISION

After following the sequential evaluation process set out in 20 C.F.R. §§ 404.1520, the ALJ concluded that Becker is not disabled. (Tr. 23.) Specifically, at step one the ALJ found that Becker last performed substantial gainful work activity on February 25, 2005. (Tr. 16.) At step two, the ALJ found that Becker has the following medically determinable "severe" impairments: cerebrovascular residuals; and cognitive disorder. (*Id.*) At step three, the ALJ found that Becker's medically determinable impairments, either singly or collectively, do not meet section 12.04 or any other section of Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings." (Tr. 16-17.) At step four, the ALJ determined that, despite Becker's medically determinable impairments, he possesses the RFC to: lift and carry 20 pounds occasionally and 10 pounds frequently; and stand, walk, or sit for 6 hours each. The ALJ also found that Becker is: "limited to simple repetitive tasks, can maintain attention, concentration, persistence and pace; can relate to and interact with others; can adapt to usual changes in work settings; and can adhere to safety rules." (Tr. 17.) The ALJ found that Becker lacks the RFC to do his past relevant work. (Tr. 22.) At the last step, the ALJ concluded that considering Becker's age,[3] education, work experience, and RFC based on all of his

---

[3]Becker's age qualified him as a "younger individual" on the date of the onset of his disability. (Tr. 22.)

impairments, jobs exist in significant numbers in the national[4] economy that Becker can perform. (Tr. 22-23.) Therefore, the ALJ found that Becker is not disabled and that he has not been under a disability from February 25, 2005, through the date of the ALJ's decision. (Tr. 23.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. *See Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Id.*

"Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's determination." *Id*. The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Id.* As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion. *Stormo v. Barnhart,* 377 F.3d 801, 805 (8th Cir. 2004).

## DISCUSSION

Becker claims that the ALJ's decision was incorrect because: 1) the ALJ's finding that Becker has the RFC to stand, walk, or sit for 6 hours is not supported by substantial evidence; and 2) the ALJ posed an improper hypothetical to the VE. (Filing No. 13, at 9.)

---

[4]The VE also testified that jobs that Becker can perform are available in significant numbers in the local economy. (Tr. 480-81.)

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole. Therefore, the Court affirms the Commissioner's decision.

***RFC***

In arguing that the ALJ's finding regarding Becker's RFC relating to his ability to stand, walk, or sit for 6 hours, Becker argues that no medical opinion exists in the record supporting this finding. Becker then argues that because RFC is a medical question, the record must include at least some medical evidence supporting the finding. (Filing No. 13, at 11-12.)

"'Residual functional capacity' is defined as the most an individual can still do despite the 'physical and mental limitations that affect what [the individual] can do in a work setting' and is assessed based on all medically determinable impairments, including those not found to be 'severe.'" *Baker v. Barnhart,* 457 F.3d 882, 889 n.3 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1545(a)(1) & (2)).

An ALJ determines a claimant's RFC based on "'all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Davidson v. Astrue,* 578 F.3d 838, 844 (8th Cir. 2009).

In Becker's case, the ALJ thoroughly weighed the following evidence in deciding the issue of Becker's RFC: Becker's physical and mental impairments; the testimony of Becker and his wife; medical records, including physical therapy records; a vocational assessment; the opinions of state agency medical consultants; and a medical source statement from nurse Virginia White. In evaluating the credibility of Becker and his wife, the ALJ concluded that their testimony is inconsistent with other evidence in the record including

medical reports, a vocational assessment, and the opinions of the state agency medical consultants. The ALJ also noted the inconsistencies between Becker's and his wife's assessment of Becker's ability to work as compared with Becker's daily activities.

In reviewing the evidence and the arguments, the Court agrees with the ALJ's summary of the documentary evidence, including medical reports. The Court was impressed by the many inconsistencies presented between the testimony of Becker and his wife and their descriptions of Becker's daily activities. For example, Becker described his busy activities caring for his three grandchildren that live with Becker and his wife. Becker often stated that he was very busy with the children, driving them to and from school and their activities and appointments, dealing with one child with serious difficulties, going to the zoo and ball games, attending a track meet, going on vacation, being busy with swim meets and vacation Bible school, and being a Boy Scout leader. Becker also described doing household chores such as laundry and taking out the trash. Also important was Becker's ability to work part-time for almost 2 years at a medium exertional level without any restrictions and, at the same time, to maintain a busy life caring for his three grandchildren. Becker left his part-time job not because he was unable to perform his duties, but rather because his employer was about to require him to work more hours and perform better.

In summary, the ALJ appropriately considered all of the relevant evidence available to him, made wise credibility determinations, and correctly determined that Becker has the RFC to perform the type of work suggested by the VE.

*Hypothetical*

Becker argues that the crucial hypothetical posed to the VE was improper because it included the impairments as stated in the ALJ's RFC assessment rather than all impairments that Becker argues were ignored by the ALJ in reaching the RFC assessment. (Filing No. 13, at 13.)  Therefore, the argument is essentially the same one addressed in the previous section of this Memorandum.

In posing a hypothetical question to a vocational expert, an ALJ must include all impairments "supported by substantial evidence in the record as a whole."  *Grissom v. Barnhart,* 416 F.3d 834, 837 (8th Cir. 2005).  In this case, the ALJ's hypothetical met this requirement.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and a separate Judgment in favor of the Defendant will be entered.

DATED this 17th day of December, 2009.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge